WIGGINS, Justice
(dissenting).
There is no majority opinion in our resolution of this case today, and therefore *33 there remains no decision from this court holding the right to counsel under article I, section 10 of the Iowa Constitution attaches only upon the filing of a criminal complaint.[22] Because the plurality and concurring opinions combine to affirm John Arthur Senn Jr.’s conviction, however, I dissent. I would hold Senn’s right to counsel under article I, section 10 of the Iowa Constitution was violated when the State arrested him on suspicion of operating while intoxicated,'invoked the statutory implied-consent procedure, asked him to submit to blood-alcohol testing, and denied him the opportunity to confidentially consult with his attorney.
Justice Waterman’s plurality opinion disregards the clear import of the phrase “in cases involving the life, or liberty of an individual” in article I, section .10 to conclude the right to counsel under the Iowa Constitution applies only once formal, criminal charges have been filed by the State. Simply put, that is not what the language in article I, section 10 says; therefore, that is not how we should interpret it. Furthermore, although the plurality opinion purports to find historical support for its crabbed interpretation of article I, section 10 in the debates of our constitutional convention, its factually inaccurate recounting of the relevant historical context renders equally inaccurate its assessment of the framers’ intentions concerning the scope of the right to counsel under the Iowa Constitution.
Iowa Code section 804.20 grants arrested persons the right to call and consult with an attorney and a family member. It provides,
Any peace officer or other person having custody of any person arrested or restrained of the person’s liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person’s family or an attorney of the person’s choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.
Iowa Code § 804.20 (2018). This case requires us to determine whether the limitations on the statutory right to counsel set forth in this provision conflict with the requirements of article I, section 10 of the Iowa Constitution as applied to a person arrested for opérating while under the influence (OWI) who must decide whether to submit to a chemical test upon request by a police officer invoking the implied-consent procedure set forth in the Iowa Code. See id. §§ 321J.6, .8, .9.
A criminal defendant is assured the right to effective assistance of counsel by the constitutional guarantees of the right to counsel contained in the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution as well as the constitutional guarantees of due process of law assuring the right to a fair trial contained in the Four *34 teenth Amendment- to the' United States Constitution and article I, section 9 of the Iowa Constitution. State v. Williams, 207 N.W.2d 98, 104 (Iowa 1973). The Sixth Amendment provides, “In' all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” U.S. Const, amend. VI. In contrast, article I, section 10 provides, “In all criminal prosecutions; and'in cases involving the life, or liberty of an individual the accused shall have a right ... to have the assistance of counsel.” Iowa Const, art. I, § 10.
We have previously determined the Sixth Amendment right to ■ counsel does not attach when a police officer invoking the implied consent procedure asks an OWI arrestee to submit to a chemical test. See State v. Walker, 804 N.W.2d 284, 293 (Iowa 2011). Accordingly, we held that denying an OWI arrestee the opportunity to consult with an attorney in the implied-consent context does not violate the Sixth Amendment to the United States Constitution. State v. Vietor, 261 N.W.2d 828, 830 (Iowa 1978).
However, we have never-.considered whether the right to counsel guaranteed by article I, section 10 of the Iowa Consth tution affords an .OWI arrestee the right to consult privately with an attorney when an officer invokes the implied-consent procedure .and asks him or her to consent to a chemical test. State v. Hellstern, 856 N.W.2d 355, 357-58, 365 (Iowa 2014). . But see Gottschalk v. Sueppel, 258 Iowa 1173, 1179, 140 N.W.2d 866, 869-70. (1966) (assuming .without deciding, the right to counsel assured by the Iowa Constitution did not apply to an administrative proceeding resulting in license revocation). .Thus, this case requires us to decide a narrow question concerning the scope of the right to counsel assured by article I, section 10. Namely, we must determine whether article I, section 10 guaranteed Senn the right to counsel after he wás arrested and Officer Cuppy invoked the implied-consent procedure. More precisely, we must determine whether Senn faced either “criminal proceedings” against him or a “cáse involving the life, or liberty of an individual” when he was asked to consent to a chemical test following-his arrest.[23] Iowa Const, art. I, § 10. :
*35 Notwithstanding the state constitutional focus of this inquiry, a brief review of. the scope of the federal right to counsel guaranteed by the Sixth Amendment to. the United States Constitution is instructive. Like the right to counsel guaranteed by article I, section 10, the right to counsel guaranteed by the Sixth Amendment applies to “all criminal prosecutions.” State v. Young, 863 N.W.2d 249,257 (Iowa 2015).
The Supreme Court has pegged the attachment of the Sixth Amendment right to counsel on “the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.” Rothgery v. Gillespie County, 554 U.S. 191, 198, 128 S.Ct. 2578, 2583, 171 L.Ed.2d 366, 374 (2008) (quoting United States v. Gouveia, 467 U.S. 180,188,104 S.Ct. 2292, 2297, 81 L.Ed.2d 146, 154 (1984))., Nonetheless, though the Sixth Amendment by its terms refers to “criminal prosecutions,” its protections need not be triggered by a prosecutor filing an indictment. See id. at 198-202, 128 S.Ct. at 2583-86, 171 L.Ed.2d at 374-77. Rather, the Sixth Amendment right to counsel attaches once “‘the government has committed itself to prosecute,’ ‘the adverse positions of government and defendant have solidified,’ and the accused ‘finds, himself faced with the .prose-cutorial forces of organized society, and immersed in the intricacies .of substantive and procedural criminal law.’ ” Id. at 198, 128 S.Ct. at 2583, 171 L.Ed.2d at 374 (quoting Kirby v. Illinois, 406 U.S. 682, 689, 92 S.pt. 1877, 1882, 32 L.Ed.2d 411, 418 (1972) (plurality opinion)). Thus, an individual may qualify as an accused for Sixth Amendment purposes before any prosecutorial involvement in a criminal proceeding against him whatsoever. See id. at 208, 128 S.Ct. at 2589, 171 L.Ed.2d at 380. In other words, the Sixth Amendment right to counsel attaches once the wheels of’ our “system of adversary criminal justice” begin to-turn. Kirby, 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417. Moreover, the -government’s commitment to prosecute an individual may be sufficiently concrete to trigger thé Sixth Amendment right to counsel once “the machinery of prosecution” has been “turned on by the local police” rather than a prose *36 cutor. See Rothgery, 554 U.S. at 208, 128 S.Ct.'at 2589, 171 L.Ed.2d at 880. At that point, a prosecution against the accused has “commenced.” See id. at 198, 128 S.Ct. at 2583, 171 L.Ed.2d at 374 (quoting McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166 (1991)).
Once the Sixth Amendment right to counsel has attached, it extends to “all critical, stages of the criminal process.” Iowa v. Tovar, 541 U.S. 77, 80-81, 124 S.Ct. 1379, 1383, 158 L.Ed.2d 209, 215 (2004). Upon attachment, “the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel’s absence might derogate from the accused’s right to a fair trial.” United States v. Wade, 388 U.S., 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967). Recognized critical stages of the criminal process at which an accused is entitled to assistance of counsel include, among others, arraignments, postin-dictment interrogations, postindictment lineups, and the entry of guilty pleas. Missouri v. Frye, 566 U.S.-,-, 132 S.Ct. 1399, 1405, 182 L.Ed.2d 379, 387 (2012).
In contrast to 'its Sixth Amendment counterpart, 'the right to counsel guaranteed by article I, section 10 of the Iowa Constitution- .applies not only in “all criminal prosecutions,” but also “in cases involving the life, or liberty of an individual.” Young, 863 N.W.2d at 257-58 (quoting Iowa Const, art. I, § 10). As the plurality acknowledges, to determine the scope of the right to counsel guaranteed by article I, section 10, we must consider how this distinction arose..
Before Iowa became a state, the provision in its territorial constitution guaranteeing the assistance of counsel to an accused provided,
In all criminal prosecutions, the accused shall have a right to a speedy trial by an impartial jury, to be informed of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.
Iowa Const, art. II, § 10 (1846). Following a state constitutional convention in 1857, Iowans voted to expand article I, section 10. Thus, the Iowa Constitution adopted in 1857 provided,’
In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.
Iowa Const, art. I, § 10 (1857). The language in article I, section 10 today remains identical to that contained in the Iowa Constitution of 1857.
The framers of our state constitution vigorously debated the scope of the right to counsel to be afforded by article I, section 10 during the constitutional convention at which our state constitution was adopted. The most spirited exchange during that debate was devoted to the question of whether the rights guaranteed by article I, section 10 should apply “in all cases involving the life, or liberty of an individual.” See 2 The Debates of the Constitutional Convention of the State of Iowa 735-41 (W. Blair Lord rep., 1857) [hereinafter The Debates ], www.statelib raryofiowa.org/services/collections/law-library/iaconst. However, the implications of that exchange for the proper interpretation of the scope of the right to counsel afforded by article I, section 10 come into *37 focus- only when we consider the historical context in which it occurred.
In 1793, Congress passed an act addressing “fugitives from justice, and persons escaping from the service of their masters.” Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (codified in part as amended at 18 U.S.C. §§ 3182-83 (2012), repealed in part 1864). Though the Extradition and Fugitive Slave Clauses[24] of the United States Constitution endorsed interstate rendition, the 1793 Act represented the first time Congress had asserted its authority to legislate it. Christopher N. Lasch, Rendition Resistance, 92 N.C. L. Rev, 149, 171 (2013) [hereinafter Lasch]. Its purpose was to facilitate the extradition of fugitives from justice, i.e., individuals alleged to have committed crimes, and fugitive slaves, i.e., individuals claimed as slaves who had fled to northern states. See Allen Johnson, The Constitutionality of the Fugitive Slave Acts, 31 Yale L.J. 161,164 (1921) [hereinafter Johnson]. Pri- or to the passage of the 1793 Act, the growing division over slavery had fueled the perceived need for federal legislation addressing the rendition of fugitives from justice, which historically had been accomplished through comity. Lasch, 92 N.C. L.Rev. at 173. Accordingly, with respect to fugitives from justice, the 1793 Act provided that upon demand and presentation of an indictment or affidavit charging a person with committing any crime, the executive of the state or territory to which the person had allegedly fled should arrest and deliver the person to the appointed agent of the state or territory from which he or she had allegedly fled. § 1,1 Stat. at 302. It further empowered the appointed agent to transport the alleged criminal to the state or territory from which he or she had allegedly fled and made interference with such transport a' crime punishable by a fine or imprisonment. § 2, Í Stat. at 302.
With respect to fugitive slaves, the 1793 Act authorized any person to whom labor or service was due, his agent, or his attorney to seize or arrest an individual, take the individual before any federal judge or local magistrate, and offer proof by oral testimony or' affidavit that the individual owed service or labor under the law of á state or territory from which he or she fled. § 3,' 1 Stat. at 302-05'. It further obligated a judge or magistrate, upon receiving proof to his satisfaction that an individual was a fugitive slave, to issue a certificate constituting a sufficient warrant for his- or her removal to the state or territory from which he or she fled. Id. The Act imposed civil penalties on individuals who obstructed or hindered the seizure or arrest of fugitive slaves and individuals who rescued, harbored, or concealed fugitive slaves. See § 4, 1 Stat. at 305. Additionally, it created a right of private action for slave owners against persons who committed such acts. See id.
*38 The rendition proceedings provided for individuals claimed as fugitive slaves under the 1793 Act were summary proceedings. During these proceedings, criminal procedural protections did not apply. The lack of due process afforded during the rendition proceedings under the Act created many opportunities for unscrupulous bounty-hunters to kidnap “the occasional free black who was likely to fetch a good price in the south.” Robert R. Dykstra, Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier 89 (1993) [hereinafter Dykstra], .To commence the summary rendition process, an individual claiming to be a slave owner or his .agent needed only a southern-judge-signed affidavit. See Lee Kovarsky, Habe-as Venté, 47 Tulsa L. Rev. 13, 16 (2011). The Act created no penalties for false claims. Jeffrey M, Schmitt, Immigration Enforcement Reform: Learning from the History of Fugitive Slave Rendition, 103 Geo. L.J. Online 1, 2 (2013) [hereinafter Schmitt],
The 1793 Act was construed to give “substantial independent responsibility to state judicial systems for adjudicating issues arising in connection with the rendition of escaped slaves.” James A. Gardner, State Courts As Agents of Federalism: Power andt Interpretation in State Constitutional Law, ,4⅜ Wm. & Mary L. Rev. 1725, 1787 (2003) [hereinafter Gardner]. Occasionally, state courts in northern states that were unfriendly to the institution of slavery “exercised their independence in ways that impeded efforts .of slave .owners to recover escaped slaves.” Id.
Nevertheless, the weak evidentiary standards sufficient to achieve lawful rendition under the 1793 Act gave rise to the kidnapping of free northern blacks through the antebellum period.' Paul Finkelman, Sorting Out Prigg v, Pennsylvania, 24 Rutgers L.J. 605, 622-23 (1993) [hereinafter Finkelman]. State governments in many northern states, including Iowa, adopted “personal liberty laws” intended to protect free blacks from kidnapping; Dykstra, at 89; Finkelman, 24 Rutgers L.J. at 623; Schmitt, 103 Geo, L.J. Online at 3.
Following the passage of the 1793 Act, rendition controversies involving fugitive slaves and fugitives from justice , continued to arise in the context of the broader dispute over slavery. See Lasch, 92 N.C. L. Rev.. at 163. With respect to fugitives from justice, southern states refused to extradite individuals accused of kidnapping free blacks to the north, and northern states refused to extradite those accused of aiding and abetting, fugitive slaves to the south. Id. at 180.
The northern states’ ill-fated legislative efforts met their demise in 1842, when the United States Supreme Court considered the constitutionality of the 1793 Act and the constitutionality of a state statute effectively forbidding the seizure and recovery of fugitive slaves in Prigg v. Pennsylvania, 41 U.S. 539, 16 Pet. 539, 10 L.Ed. 1060 (1842). In Prigg, the Court concluded the Fugitive Slave Clause granted Congress exclusive power to legislate on the subject of fugitive slaves. 41 U.S. at 541-42, 617-18, 10 L.Ed. at 1061, 1090. Thus, the Court held .unconstitutional “any state law or state regulation, which interrupts, limits, delays or postpones the right of the owner to the immediate possession of the slave, and, the immediate command of his service and labor.” Id. at 540, 612, 10 L.Ed. at 1061, 1088. In contrast, the Court upheld the provisions of the 1793 Act setting forth procedures for the rendition of fugitive slaves to be constitutional, save for the provision compelling local magistrates to issue certificates authorizing the removal of fugitive slaves while *39 acting in their official state judicial capacities. Id. at 582, 622, 10 L.Ed. at 1077, 1091. The Court invalidated the- provision compelling local magistrates to act on the theory that Congress may not convey authority to exercise the federal judicial power to persons not holding federal government commissions. Id.
Prigg effectively invalidated all state legislation giving procedural protections to individuals claimed as fugitive slaves under the 1793 Act. Schmitt, 103: Geo. L.J. Online at 3. Paradoxically, Prigg virtually nullified the portion of the 1793 Act authorizing the removal of fugitive slaves from northern states. See id. at 4. Though Prigg- rendered northern states unable to legislate procedural protections for individuals claimed as fugitive slaves at the státé .and local level, it also forbid Congress from compelling, state cooperation in rendition proceedings under the Act. As a result, in the aftermath of Prigg, some northern states passed, more robust “personal liberty laws” intended to end all state cooperation in the rendition of individuals claimed as fugitive slaves by barring state judges and law enforcement officers from any involvement therein. Lasch, 92 N,C. L. Rev. at 178; Schmitt, 103 Geo. L.J. Online at 3. In other northern states, state judges simply declined to hear rendition proceedings involving alleged fugitive slaves. Finkel-man, 24 Rutgers L.J.- at 664. The unintended consequence of Prigg was that without assistance from local state judges and local law enforcement, recovery of fugitive slaves became far more difficult. See id.; Schmitt, 103 Geo. L.J, Online at 4.
Congress responded to this state of affairs by passing an Act as part of the Compromise of 1850 to amend and supplement the 1793 Act. Act of Sept. 18, 1850, ch. 60, 9 Stat. 462 (repealed 1864).. In passing the 1850 Act, Congress sought to empower the federal government to. enforce the fugitive slave law despite northern resistance. Schmitt, 103 Geo. L.J. Online at 4:-The 1850 Act did not repeal any portion of the 1793 Act. Johnson, 31 Yale L.J. at 169-72,. Instead, it created the vast federal infrastructure necessary to meet the demand for fugitive slave rendition proceedings by authorizing federal judges to appoint commissioners with authority to preside over those proceedings and issue certificates permitting the removal of individuals claimed as slaves. See §§ 1-4, 9 Stat. at 462. In addition, it made a marshal’s refusal to receive or execute an arrest warrant for an alleged fugitive slave a crime punishable by a fine of one thousand dollars and subjected marshals to civil liability for the value of the labor of fugitive slaves who escaped from their custody. See § 5, 9' Stat. at 462-63. It further authorized commissioners to appoint persons to assist in the execution of arrest warrants and gave persons- so authorized the power to summon bystanders to their aid. Id.
Besides creating the federal machinery necessary to implement fugitive slave rendition, the 1850 Act explicitly authorized slave owners and their agents to reclaim fugitive slaves by procuring arrest warrants or seizing and arresting them directly “without process.” § 6, 9 Stat. at 463. Following arrest, an- alleged fugitive slave was to be brought before a commissioner or judge whose duty was- to “hear and determine the case .in a summary manner.” Id. ' Upon receipt of “satisfactory proof,” the commissioner or judge was to issue a certificate that'would be “conclusive of the right” of the person in whose favor it was granted to remove the fugitive slave to the state or territory from whence he came and “prevent all molestation of such person ... by any process issued by any court, judge, magistrate, or other person.” § 6, 9 Stat. at 463-64. A deposition transcript or affidavit duly authenticated *40 by any court in the state or territory from which a fugitive slave allegedly escaped in which the claimant affirmed the identity of the alleged fugitive slave and affirmed that individual in fact owed him service or labor constituted “satisfactory proof’ under the Act. § 6, 9 Stat. at 463. The 1850 Act expressly forbid the admission of testimony by alleged fugitive slaves into evidence in them own rendition proceedings. Id. It also provided that each commissioner charged with hearing rendition proceedings was to be paid a fee of ten dollars for each proceeding in which he granted a certificate authorizing the removal of a fugitive slave and five dollars for each proceeding in which he did not. § 8, 9 Stat. at 464. Finally, unlike the 1793 Act, the 1850 Act subjected any person who obstructed or hindered the arrest of a fugitive slave, aided or abetted the escape of a fugitive slave, or harbored or concealed a fugitive slave to civil and criminal liability, making such acts a crime punishable by a fine of one thousand dollars and six months’ imprisonment and making persons who committed such acts liable to slave owners in civil debt proceedings. § 7, 9 Stat. at 464.
Following the passage of the 1850 Act, the fugitive slave law clearly had much sharper teeth. H. Robert Baker, The Fugitive Slave Clause and the Antebellum Constitution, 30 Law & Hist. Rev. 1133, 1163 (2012) [hereinafter Baker]. Indeed, it appeared to have been “drawn with diabolical ingenuity.” Johnson, 31 Yale L.J. at 171. As one legal commentator noted, “The features which made this act so odious to men and women who abhorred human slavery strike one in the face.” Id. The provisions in the Act severely curtailing the process available to individuals alleged to be fugitive slaves were particularly problematic:
Even if an alleged fugitive slave claimed mistaken identity, he was forbidden to testify, and relegated to a summary ju-ryless proceeding in which the magistrate would pocket ten dollars if he found for the slave catcher but only five dollars if he found for the black man.
Akhil Reed Amar, The Supreme Court, 1999 Term — Foreward: The Document and the Doctrine, 114 Harv. L. Rev. 26, 70 (2000) [hereinafter Amar],
During heavily attended public meetings in northern states, the amended fugitive slave law was broadly condemned as immoral and unconstitutional. Baker, 30 Law & Hist. Rev. at 1165. Because it sharply curtailed the ability of northern states to provide “basic fair-trial rights, including an unbiased decision-maker” to alleged fugitive slaves, its passage also “heightened abolitionists’ sensitivity to fair procedure.” Elizabeth B. Wydra, The Fourteenth Amendment’s Due Process Clause and Caperton: Placing the Federalism Debate in Historical Context, 60 Syracuse L. Rev. 239, 242 (2010). Although the amended fugitive slave law did not forbid individuals claimed as fugitive slaves from being represented by counsel during their summary rendition proceedings, it did not guarantee counsel for alleged slaves. Paul Finkelman, Legal Ethics and Fugitive Slaves: The Anthony Bums Case, Judge Loving, and Abolitionist Attorneys, 17 Cardozo L. Rev. 1793, 1804 (1996). Therefore, even though the summary proceedings provided for under the amended law were technically civil proceedings, several northern states provided appointed counsel to individuals claimed as fugitive slaves facing the prospect of rendition. Amar, 114 Harv. L.Rev. at 68 n. 133; Robert A. Mikos, Indemnification As an Alternative to Nullification, 76 Mont. L. Rev. 57, 58-59, 59 n. 9 (2015). Additionally, “states continued to pass personal liberty laws and, in some areas, state officials even actively interfered with federal en- *41 forcementSchmitt, 103 Geo. L.J. Online at 4[25]
It was against the backdrop of this history that the framers of the Iowa Constitution debated the content of the guarantees to be afforded Iowans under article I, section 10 and the circumstances in which those guarantees ought to apply.
On the thirteenth day of the convention, the framers accepted a proposed amendment to the draft constitution adding the “cases” language to article I, section 10. 1 The Debates, at 201. Thereafter, as it appeared in the draft constitution the framers considered during the convention, the text of article I, section 10 provided,
In all criminal prosecutions, and in all cases involving the life or liberty of an individual, the accused shall have the ' right to a speedy and public trial by an impartial jury, to be informed of the accusation against him, and have a copy of the same when demanded; to be confronted with the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.
See id.[26] More than two weeks later, on the thirty-first day of the convention, Mr. Amos Harris of Appanoose County moved to strike the “cases” language from article I, section 10. 2 The Debates, at 736. Specifically, Mr. Harris proposed striking the phrase “and in all cases involving the life or liberty of an individual” from article I, section 10, sparking a fiery debate among the framers as to the meaning and effect of that phrase. Id. at 736-41.
In support of his proposal to remove the “cases” language from article I, section 10, Mr. Harris stated his belief that its import would be “to give any person that may be arrested, who may be taken up in any shape or way in this state, the right of jury trial immediately, and in this state.” Id. at 736. He then explained why providing persons who had “.taken up” within the state the right to a jury trial within it would conflict with the United States Constitution. Id. With respect to fugitives from justice who committed a crime in another state and fled to Iowa, he argued the United States Constitution required such persons to be tried where the offense was committed. Id. With respect to individuals claimed as fugitive slaves who fled to Iowa, he asserted such persons could not have a jury trial within the State because state law “would prevent any person from proving their right to the labor of any person who might be a slave” as they would be unable to establish a property right in another person. Id,[27] Accordingly, *42 Mi; Harris opined that providing fugitive slaves the right to a jury trial in Iowa “would be equivalent to saying at once, that any slave in the territory of this state shall have the right to assert his freedom, and cannot be remanded back into slavery.” Id.
The first person to speak in favor of retaining the “cases” language was Mr. John Clark of Allamakee County. Id. at 737. Mr. Clark argued the United States Constitution already secured “to any individual who -may be arrested under the laws of this State or under the jurisdiction of this State” all the ■ rights that would be secured to him by the “cases” language in.article I, section 10. In his view, the .federal constitutional provision stating no person, shall be deprived of life, liberty, or property without due process of law already guaranteed that factual determinations implicating the liberty of alleged fugitive slaves would be made in common law courts. See id. But he asserted the “cases” language would have “no reference”' to alleged fugitives from justice “being arrested in preparation for trial,” arguing it would merely assure such an individual would not “be deprived of liberty ,.. upon the trial which is to settle for all coming time the questions as to his right to liberty.” Id. He asked, “Are not persons arrested every day for the purpose of examination, to ascertain whether there is proper cause for retaining them until they shall be put on final trial?” Id.
Mr. Clark acknowledged the intent of the “cases” language was to prevent alleged fugitive slaves from having their fate summarily determined in another state without process. During his passionate speech on the convention floor, he argued the “cases” language would secure trial rights essential to state sovereignty:
Gentlemen will say perhaps that there is no danger of my being claimed as a fugitive slave. I do not know whether there is not. I apprehend that people as white ,as I am have been claimed as fugitive slaves. And if I am found within the jurisdiction of this State, it is a principle of sovereignty, that if I am arraigned upon a charge that I do not own myself, that I am not a free man, I have the right to a trial here where I am found; and the laws of the State should guarantee to me that right. We cannot be independent, we cannot be sovereign, without that right. We cannot protect our citizens without it. I do not care whether the case is probable or not.
Id. at 737-38. He also sought to illustrate the practical effect of providing only minimal procedural protections to individuals claimed as fugitive slaves under the amended fugitive slave law:
Suppose that a man in Missouri comes over here and claims a horse, which he finds in my possession. He cannot dispossess me of that horse and take it to Missouri without giving me the benefit of a jury trial to ascertain whether that horse is mine or his. But if he wishes to put in a false claim to that horse, which he would be unwilling to submit to a jury of this State, where I have the means of proving that the property is mine, all he has to do is to go back to Missouri and make out a case describing me as a fugitive slave. Then he can take me, deprive me of ,my right of being heard by a jury, and thus secure me and my horse too! .
Id', at 738.’ Unsurprisingly, he believed there were “serious doubts” as to the constitutionality of 'the fugitive slave law. Id. But he acknowledged that if the law were constitutional, “the higher law, the law of the United States,” would prevail over article I, section 10. Id.
*43 Next, Mr. James Wilson of Henry County spoke in favor' of retaining the “cases” language in article I, section 10, arguing its application in the context of alleged fugitive slaves was vastly different than its application in the context of fugitives from justice. Id. at 738-39. According to Mr, Wilson, the reason an alleged fugitive from justice accused of committing a particular crime was to be delivered' upon demand by thé governor of the • state; in which the crime was committed was that only that state had jurisdiction to punish its commission. Id. at 739. In contrast, he pointed out, a charge alleging a person is a fugitive slave “is primary in its- character, and is brought” wherever he or she is found. Id. In concluding, Mr. Wilson argued the “cases” language reflected important principles recognized by the founding fathers, stating, - ■
If there is anything in the' government of the United States which has sprung up from the interpretation of the constitution, or which has grown out of the statutes of Congress, with which the provision under consideration comes in conflict, then I say the sooner we get rid of it the better, the sooner we assert our determination to stand by the principles of the Fathers,- the better for our country, the better for ourselves, the better -for posterity.

Id.

Finally, Mr. J.C. Hall of Des Moines County spoke passionately in favor of striking the “cases” language from article I, section 10, Id. at 740, In particular, Mr. Hair argued those who sought to retain the “cases” language in article I, section 10 sought to exceed the limits of state sovereignty:
In some things this State is sovereign; but in some things it is not sovereign. In some things the United States are sovereign, and in some things they are not sovereign.... Now, sir, as to-this subject upon which this insidious clause .is attempted to be engrafted into our Constitution, we, as a State,-have said that the United States should be sovereign upon that question.... It is part of - the Constitution. of the , United States..;.. Now, sir, the person who wishes to bring our State into collision with that instrument, or who wishes to put into our constitution a defiance against the- exercise of that branch of sovereignty confided to the United States, and yielded to the United States by the Constitution, goes one step toward becoming a traitor to that instru- . ment.
[[Image here]]
..'. That government is supreme in regard to that question. The decisions of its1.'courts are supreme with regard -to it. We cannot interfere without collision and rebellion against that Constitution. Are we now to make our primary law ■ come in conflict with that? ... I do not believe' that the majority of this convention can be brought- into collision with the General Government upon that matter, or sow the seeds of treason in the constitution we are framing.
Mat 740-41.
After Mr. Harris, Mr. Clark, -Mr. Wilson, and Mr. Hall had each expressed their views concerning the effect of the phrase “in all cases involving the life or liberty of an individual” on the rights afforded by article I, section 10, the convention voted on the proposal to strike it from the draft constitution. - Id. at 741. The convention rejected that proposal and voted to retain the “cases” language by a vote of 21 to 14. ■Id.
When considered in historical context, we can infer much about the framers’ intentions concerning the. “cases” language appearing in article I, section 10 from their *44 debate over its inclusion in the Iowa Constitution.
First, it appears clear that the primary concern of those who wished to strike the “cases” language from article I, section 10 was that its inclusion would cause the Iowa Constitution'to conflict with federal'law and the United States Constitution. See id. at 736, 740-41. To this concern, the framers who spoke in''favor of retaining the “cases” language responded in myriad ways. In response to the assertion article I, section 10 would conflict with the fugitive slave law if it included the “cases” language, they contended the fugitive slave law was itself unconstitutional because it denied alleged fugitive slaves the rights secured to them under the United States Constitution. Id. at 737-39. As for the assertion that the “cases” language would cause our state constitution to conflict with the federal law governing the "extradition of fugitives from justice, they .argued the inclusion of the “cases” language would not secure article I, section 10 rights to individuals charged with crimes in other states or territories. See id. at 737, 739. In drawing that conclusion, they noted that under the fugitive slave law, as opposed to the law governing the extradition of fugitives from justice, the final determination regarding an accused person’s liberty was to be made in a proceeding occurring within the State. See id.[28]
Second, it is evident framers on both sides of the debate recognized the phrase “in all cases involving the life or liberty of an individual” was broad enough to apply in civil cases in which a final determination of an individual’s liberty was to be made within the State. Whatever differences of opinion existed among the framers as to how best to interpret the “cases” language in article I, section 10, those differences by no means overshadowed the similarities. Rendition proceedings under the fugitive slave law were civil proceedings. Amar, 114 Harv. L. Rev. at 68 n.133. The law required any person- who., arrested an alleged fugitive slave to bring the arrested individual before a court, judge, or commissioner “of the proper circuit, district, or county, for the apprehension of such fugitive.”- See § 6, 9 St'at. at 463. It further required any commissioner or judge presiding over such a proceeding to issue a certificate conclusive of the individual’s right to liberty upon presentation of a duly authenticated transcript or affidavit stating he or she owed service or labor. See id.; see also Johnson, 31 Yale L.J. at 170-71. Furthermore, a rendition proceeding constituted the only summary proceeding during which the liberty of an alleged fugitive slave was to be determined under the law — essentially an initial appearance and a proceeding on the merits rolled into one.
Third, there can be no dispute that the framers generally understood the “eases” language would extend article I, section 10 rights to criminal cases in addition to civil ones. The language the framers considered and voted to approve during the debates at the constitutional convention plainly referred to “all cases involving the life or liberty of an individual.” 1 The Debates, at 201 (emphasis added); 2 The Debates, at 741 (emphasis added). The disagreement among the framers as to whether including the “cases” language in article I, section 10 would secure rights to fugitives from justice by no means suggests the framers disagreed concerning its plain meaning. At a minimum, cases involving the life of an individual include criminal prosecutions in which the death *45 penalty is sought, and cases involving the liberty of an individual include those in which an individual’s physical liberty is at stake by means of his or her arrest. That the framers debated the question of whether the “cases” language would extend article I, section 10 rights to fugitives from justice confirms that they believed its plain meaning was broad enough to extend those rights to criminal cases implicating the liberty of individuals accused of crimes at least in cases in which Iowa courts have jurisdiction to punish criminal conduct. See 2 The Debates, at 736-39. Hence, the subsequent vote of the convention to retain the “cases” language clearly signals the framers’ intent to extend article I, section 10 rights to criminal cases involving, the arrest of an individual.
Fourth, during the debates, the framers acknowledged that cases in which individuals have been arrested implicate physical liberty interests sufficient to trigger rights under the “cases” language of article I, section 10.[29] The fugitive slave law and the law governing the extradition of fugitives from justice authorized the physical seizure and arrest of individuals claimed as fugitive slaves and individuals charged with committing crimes in other states and territories, respectively. See § 6, 9 Stat. at 463; § 1, 1 Stat. at 302. Though the framers did not unanimously agree as to whether the inclusion of the “cases” clause in article I, section 10 would secure rights to fugitives from justice who would ultimately be tried on criminal charges in other states, the framers implicitly agreed that its import was to secure article I, section 10 rights to all arrested persons facing a final determination of their rights under the jurisdiction of our state courts. See 2 The Debates, at 736-39. ' In fact, even Mr. Harris, who opposed the inclusion of the clause, argued its import would be to extend the reach of article I, section 10 to “any person that may be arrested, who may be taken up in any shape or way in this state.” Id. at 736.
Fifth, the framers understood the inclusion of the phrase “in all cases .involving the life or liberty of an individual” in article I, section 10 would extend rights thereunder beyond the formal initiation of judicial proceedings in qualifying cases involving liberty. See id., at 736-39. The first edition of Black’s Law Dictionary .indicated .the term “case”, historically was understood to be a “.general term for an action, cause, suit, or controversy, at law or in equity.”- Case, Black’s Law Dictionary (1st ed. -1891). It further described the term “cause” as generally referring not “to the legal procedure of a controversy” but “to its merits or the state of facts involved.” Cause, Black’s Law Dictionary (emphasis added).
Importantly, the historical context in which the framers adopted the “cases” clause appearing in article I, section 10 yields additional insights into their intentions. In particular, history indicates the framers sought to assure that individuals involved in cases implicating their liberty 'had the ability to defend it effectively, not merely the right to be heard before a jury.
*46 By its terns, the fugitive slave law granted alleged fugitive slaves a statutory right to determinations as to their identity and whether they in fact owed service or labor.' See § 6, 9 Stat. at 463. But such determinations were to be made immediately .following their arrest during summary proceedings presided over by biased decision-makers in which procedural protections would be severely . curtailed. ■ See id. Even if the law had secured alleged fugitive slaves the right to have those determinations made by impartial juries, it is hard' to imagine how an alleged fugitive slave' might have secured his' liberty during a summary proceeding in which he was barred from testifying in his own defense and lacked the ability to confront the person whose deposition testimony or affidavit was offered against him. See id. • The rights, to “assistance of counsel” and “compulsory process for his witnesses” could only have meaningfully assisted him in the context of a summary proceeding if they attached before that proceeding took place. See Iowa Const, art,.I, § 10.
More 'fundamentally, as the plurality opinion recognizes, the “cases” clause of article I, section 10 was adopted, at least in part, to restore process stripped away by the fugitive slave law, Consequently, it is particularly relevant to its proper interpretation that the Iowa Constitution was adopted in the midst of the antebellum era. Though we now generally recognize the escalating tensions between the northern and southern states had nearly reached their apex at that time, the framers of the Iowa ‘Constitution lacked the' benefit of hindsight in an uncertain age. Given their apparent motivations and 'the context in which those motivations arose, the framers surely did not intend the “cases” clause to be narrowly' interpreted. As we have previously recognized, “the ‘cases’ language of article I, section 10 has broader application than the immediate problem it was designed to ameliorate.” Young, 863 N.W.2d at 279.
When carrying out our fundamental and vital role to interpret the. state constitutional guarantees invoked by individuals appearing before us, “we must never forget that it is a constitution, we are expounding.” Varnum v. Brien, 763 N,.W.2d 862, 876 (Iowa 2009),(quoting McCulloch v, Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 679, 602 (1819)). As we have previously recognized in the context of interpreting article I, section 10,
unlike statutes, our constitution sets out broad general principles. A constitution is a living and vital instrument. Its very purpose is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption.
In re Johnson, 267 N.W.2d 47, 50 (Iowa 1977). The framers of the Iowa Constitution created “a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.” Honorable Mark S. Cady, A Pioneer’s Constitution: How Iowa’s Constitutional History Uniquely Shapes Our Pioneering. Tradition in Recognizing Civil Rights and Civil Liberties, 60 Drake L. Rev... 1133, 1148 (2012) (quoting McCulloch, 17 U.S. at 415, 4 L.Ed. at 579).
We have long recognized the plain meaning of the language in the “cases” clause of article I, section 10 suggests that it extends the rights enumerated therein “beyond criminal prosecutions.” Johnson, 257 N.W.2d at 53. We have also recognized its inclusion in article I, section 10 amounts to strong support for interpreting the right to counsel to apply not only to civil cases in which “liberty” interests are implicated, but also to criminal cases in which “liberty” is at stake. Young, 863 N.W.2d at 279. In light of the plain mean *47 ing of the language contained in the “cases” clause and the historical context in which it was-adopted, it is time we recognized that the phrase “in cases involving the life,, or liberty of an individual” in article I, section 10 extends the right to counsel under the Iowa Constitution at least to arrested individuals suspected of crimes with respect to which their guilt or innocence will be determined in a judicial proceeding under the jurisdiction of our state courts.
Our decision, in Ex parte Grace, 12 Iowa 208 .(1861), a case we decided just four years after the 1857 adoption of article I, section 10, reinforces my conclusion concerning the proper scope of the right to counsel afforded by the “cases” clause. In Grace, we held a civil statute authorizing supplementary proceedings in aid of execution violated article I, section 10. Id. at 211-12, 217. The statute authorized judges to find facts, order judgment debtors to deliver property in satisfaction of debts, and order the arrest and, imprisonment of judgment debtors found guilty of contempt for failing to follow such orders. Id, at 211-12. In concluding the statute violated article I, section 10, we stated,
It is claimed by counsel that the change in § 10, of the Bill of Rights, was only intended to meet the case of a fugitive slave. Whatever may have been the primary motive of some, or all of the members of the constitutional convention, in incorporating this provision, we can certainly see no reason in the nature of things, nor in the language employed, to justify the conclusion that white men were not also entitled to the benefit'of it. We can not believe that it was intended to give the right of trial by jury to the occasional fugitive slave found in our State, and to withhold it in cases of equal magnitude and vital importance, from the half million of free white inhabitants of the State.
Id. at 213. The same analysis applies with respect to the right to counsel secured under article I, section 10 today when the State arrests an individual suspected of a crime who faces the prospect of a final determination as to his or her guilt or innocence.
For these reasons, I believe Senris right to counsel attached when he was arrested for suspicion of driving under the influence in violation of Iowa Code section 321J.2, a serious misdemeanor. At that point, Senn faced a case involving his liberty within the meaning of article I, section 10. Thus, I now consider whether Senn faced a critical stage in the criminal process associated with his case when Officer Cuppy read him the implied-consent advisory and asked him to submit to a chemical test. If so, article I, section 10 guaranteed him the right to effective assistance of counsel.
When an individual suspected of driving under the influence submits to a chemical test that will determine his or her blood-alcohol concentration, that individual may be providing the government with “nearly conclusive evidence of a serious crime,” Missouri v. McNeely, 569 U.S.-,-, 133 S.Ct. 1552, 1571, 185 L.Ed.2d 696, 718 (2013) (Roberts, G.J., concurring in part, dissenting in part). In a prosecution .for OWI under Iowa Code section 321J.2, the State may prove its case merely by showing beyond a reasonable doubt (1) that the defendant operated a motor vehicle (2) while having a blood-alcohol concentration of .08 . or more. , See Iowa Code § 321J.2(1)(6). To lawfully arrest an individual for OWI, an officer must have probable cause to believe each element of the offense has occurred. See State v. Lindeman, 555 N.W.2d 693, 696 (Iowa 1996).
Often when an officer arrests an individual suspected of OWI, the officer has witnessed him or her operating a motor *48 vehicle in an erratic fashion. Alternatively, the officer might have witnessed the individual engaging in other conduct suggesting his or her intoxication during a routine stop for a minor traffic violation. The point is that before an officer may lawfully arrest an individual for the offense of OWI, the officer must have probable cause to believe the individual was driving while in an intoxicated state. In other words, the officer must conclude the totality of the circumstances viewed by a reasonably prudent person would lead him or her to believe the individual drove a motor vehicle with the requisite degree of intoxication. The officer’s testimony will ordinarily be sufficient to prove the first element of the State’s case in a drunk-driving prosecution. Thus, the State will have effectively proven its case if the results of a chemical test to which the defendant submitted following arrest indicate the defendant had a blood-alcohol concentration of .08 or higher.
The United States Supreme Court’s recent decisions addressing the admissibility of evidence obtained by officers invoking implied-consent procedures support the conclusion that an arrested individual deciding whether to submit to a chemical test after an officer administers an implied-consent advisory faces a critical stage of the criminal process under the Iowa Constitution. In Missouri v. McNeely, a driver arrested on suspicion of operating while intoxicated refused to provide a blood sample upon request after an officer administered a routine implied-consent advisory. — U.S. at-, 133 S.Ct. at 1557,
185 L.Ed.2d at 702-03 (majority opinion).[30] However, the officer ordered the driver’s blood be drawn for chemical analysis without a warrant despite the driver’s refusal to consent. Id. at-, 133 S.Ct. at 1557, 185 L.Ed.2d at 703. The Court framed the issue on appeal as one concerning the admissibility of a “nonconsensual” chemical test. Id. at-, 133 S.Ct. at 1558,185 L.Ed.2d at 703-04. Five justices concluded the natural dissipation of alcohol in the bloodstream did not create a per se exigency to the warrant requirement and determined the existence of an exigency in the drunk-driving context “must be determined case by case based on the totality of the circumstances.” Id. at-, 133 S.Ct. at 1556, 185 L.Ed.2d at 702. The five justices agreed that in “drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.” Id. at --, 133 S.Ct. at 1561, 185 L.Ed.2d at 707. In the immediate wake of McNeely, numerous state courts concluded implied-consent schemes permitting war-rantless blood draws from suspected drunk drivers in the absence of affirmative consent violate the Fourth Amendment. See, e.g., State v. Butler, 232 Ariz. 84, 302 P.3d 609, 613 (2013) (en banc); State v. Wulff, 157 Idaho 416, 337 P.3d 575, 578, 582 (2014); Byars v. State, — Nev.-, 336 P.3d 939, 945-46 (2014); State v. Fierro, 853 N.W.2d 235, 243 (S.D.2014); State v. Wells, No. M2013-01145-CCA-R9-CD, 2014-WL 4977356, at *13 (Tenn.Crim.App. *49 Oct. 6, 2014); Weems v. State, 434 S.W.3d 655, 665 (Tex.App.2014), aff'd, — S.W.3d -, 2016 WL 2997333 (Tex.Crim.App.2016) petition for discretionary review granted (Aug. 20, 2014); see also State v. Declerck, 49 Kan.App.2d 908, 317 P.3d 794, 804 (2014), review denied (June 20, 2014).
Just three years after McNeely, the Court analyzed the admissibility of war-rantless blood and breath tests administered on individuals arrested on suspicion of drunk driving as searches incident to arrest in Birchfield v. North Dakota, 579 U.S. 560, -, 136 S.Ct. 2160, 2166, 195 L.Ed.2d 560,-(2016). Ultimately, the Court determined the warrantless administration of a blood test to determine the blood-alcohol level of a person arrested for drunk driving violates the Fourth Amendment, but the warrantless administration of a breath test under the same circumstances is permissible as a search incident to arrest. Id. at-, 136 S.Ct. at 2176, 195 L.Ed.2d at-. Therefore, a state statute imposing a criminal penalty on an individual arrested on suspicion of drunk driving who refuses to submit to a war-rantless breath test to determine his or her blood-alcohol level does not violate the United States Constitution, but a state statute imposing a criminal penalty for an individual’s refusal to submit to a warrant-less blood test following his or her arrest on suspicion of drunk driving is unconstitutional. Id. at-,-, 136 S.Ct. at 2171, 195 L.Ed.2d at-,-.
The McNeely and Birchfield decisions illustrate that an individual seeking to understand the scope of his or her rights under the United States Constitution in the implied-consent context would almost certainly require the benefit of legal counsel in order to do so. The same observation surely applies to any individual questioning the scope of his or her rights in the implied-consent context under the Iowa Constitution.
Admittedly, when an officer invokes Iowa’s implied-consent procedure and asks an individual who is under the influence to submit to chemical testing, that individual ultimately faces an adverse consequence, whether in the form of a criminal penalty •or a civil penalty. See Iowa Code §§ 321J.2(2)-(7), .9(1) — (2). A first OWI offense is punishable by a minimum period of imprisonment for forty-eight hours with a total period of incarceration not to exceed one year or a deferred judgment with probation. Id. § 321J.2(3). A first refusal to submit to a chemical test results in the automatic revocation of one’s license for a period of a year with eligibility to apply for a temporary restricted license after ninety days. Id. §§ 321J.9(l)(a), .20. Weighing the pros and cons of deciding between these two alternatives would be difficult for most people under the best of circumstances. To make the right decision, an individual suspected of OWI must quickly consider not only what the State can prove and what the likely penalty will be, but also what the future consequences might be for his or her occupation, family, and personal wellbeing. The decision is final, and it will determine both the range of criminal penalties the individual will face and the charge that will appear on his or her permanent criminal record. In these respects, the decision to submit or refuse to submit to a chemical test resembles the decision to plead to criminal charges.
For these reasons, I would conclude Senn faced a critical stage of the criminal process in the case against him when Officer Cuppy read him the implied-consent advisory and asked him- to submit to a chemical test to determine his blood-alcohol concentration. Because I believe Senn was entitled to the assistance of counsel under article I, section 10 of the Iowa *50 Constitution, I believe he was also entitled to effective assistance of ■ counsel. Williams, 207 N.W.2d at 104. We previously recognized that “if a criminal defendant is to receive the full benefits of the light to counsel, the confidence and privacy of communications with counsel must be assured.” Wemark v. State, 602 N.W.2d 810, 816 (Iowa 1999). Accordingly, I conclude Senn was entitled to communicate with his attorney confidentially and privately under article I, section 10. See Walker, 804 N.W.2d at 293.
In my view, the plurality and concurring opinions fail to appreciate that the liberty interests, of individuals who .have been arrested and read implied-consent advisories are liberty interests the Iowa Constitution was clearly intended to protect. See Grace, 12 Iowa at 213. I would therefore reverse Senn’s conviction. For these reasons, I respectfully dissent.
HECHT and APPEL, JJ., join this dissent.

. In a plurality opinion joined by Justices Mansfield and Zager, Justice Waterman concludes the right to counsel under article I, section 10 of the Iowa Constitution attaches ' upon the filing of a criminal complaint. In his special concurrence, Chief Justice Cady leaves open the question of'when the right to counsel attaches under the Iowa Constitution.

. As we have previously acknowledged, the constitutional guarantees of due process of law afforded by the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution may require the appointment of counsel for indigent persons in contexts other than criminal prosecutions. See State ex rel. Hamilton v, Snodgrass, 325 N.W.2d 740, 742 (Iowa 1982); McNabb v. Osmundson, 315 N.W.2d 9, 14 (Iowa 1982); see also Turner v. Rogers, 564 U.S. 431, 444-45, 131 S.Ct. 2507, 2517-18, 180 L.Ed.2d 452, 463-64 (2011); Walters v. Nat’l Ass'n of Radiation Survivors, 473 U.S. 305, 332, 105 S.Ct. 3180, 3195, 87 L.Ed.2d 220, 240 (1985); Lassiter v, Dep’t of Soc. Servs., 452 U.S. 18, 31-32, 101 S.Ct. 2153, 2161-62, 68 L.Ed.2d 640, 652 (1981). For example, to determine whether an indigent person has a federal due process right to counsel when the Sixth Amendment right to counsel does not apply, a court must apply a
modified version of the balancing test set forth in Mathews v. Eldridge, 424 U.S.-319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). Lassiter, 452 U.S. at 26-27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649; Snodgrass, 325 N.W.2d at 742.
Senn raised only his right to counsel under article I, section 10 of the Iowa Constitution before the district court. Thus, we do not consider whether his right to due process of law under the federal and state constitutions entitled him to effective assistance of counsel under the facts of this case. See Meier v. Senecaut, 641 N.W.2d 532, 537 (Iowa 2002) . ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.”). We-previously concluded a defendant-.who was not permitted the opportunity to speak with' his attorney by phone before he consented to a *35 chemical test was not deprived of due process of law without suggesting we considered the claim under both the United States Constitution and the Iowa Constitution. Gottschalk, 258 Iowa at 1176, 1181-82, 140 N.W.2d at 868,870-71.
The United States Supreme Court also recognized a limited right to counsel in the context of custodial interrogations implicating the Fifth Amendment privilege against compelled self-incrimination in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct, 1602, 16 L.Ed.2d 694 (1966). McNeil, v. Wisconsin, 501 U.S, 171, 176, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158, 167 (1991). However, the Miranda right to counsel under the Fifth Amendment to the United States Constitution does riot extend to an OWI arrestee's choice to refuse chemical testing when an officer invokes implied-consent procedures because "a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of Miranda." South Dakota v. Neville, 459 U.S. 553, 564 n. 15, 103 S.Ct. 916, 923 n. 15, 74 L.Ed.2d 748, 759 n. 15 (1983). .
Although the Iowa Constitution does not contain an express provision equivalent to the Fifth Amendment guarantee against compelled self-incrimination, a right against compelled self-incrimination is implicit in the article I, section 9 guarantee of due process of law. State v. Iowa Dist. Ct., 801 N.W.2d 513, 518 n. 2 (Iowa 2011). Before the district court, Senn did not argue an officer asking him to- consent to a chemical test constituted the functional equivalent of custodial interrogation to which a prophylactic right to counsel. broader than that afforded by Miranda and its progeny might apply under the Iowa Constitution. Accordingly, we need not consider whether an officer asking an arrestee to consent to chemical testing upon reading an implied-consent advisory constitutes an inherently coercive circumstance in which the due process guarantee of article I, section 9 affords the arrestee the assistance of counsel.

. The Extradition' Clause of the United States Constitution provides,
A person charged in any State with Treason, Felony, or other Crime, who shall flee , from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.
U.S. Const, art. IV, § 2, cl. 2.
The Fugitive Slave Clause of the United States Constitution provides,
No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be .delivered up on Claim of the Party to whom such Service or Labour may be due.
U.S. Const, art. IV, § 2, cl. 3, superseded by
U.S. Const, amend.' XIII.

. When a case involving interference with enforcement of the Act finally reached the Supreme Court in 1859, the Court summarily upheld the Act as constitutional in its entirety. Ableman v. Booth, 62 U.S. 506, 507, 526, 21 How. 506, 16 L.Ed. 169, 170, 177 (1858).

. We acknowledge the text appearing in article I, section 10 of the 1857 Iowa Constitution differed from that approved during the constitutional convention in two respects. Compare 2 The Debates, at 741, with Iowa Const, art. I, § 10 (1857). First, it did not contain the word "all" before the word "cases.” Second, it included a comma after the word "life." The transcript of The Debates contains no explanation for these differences, as the vote rejecting the proposal to eliminate the phrase “and in all cases involving the life or liberty of an individual” from article I, section 10 was the last occasion on which the framers discussed article I, section 10 on the convention floor.

.The Supreme Court of the Territory of Iowa, in its first reported case, had "refused to treat a human being as property to enforce a contract for slavery and held our laws must extend equal protection to persons of all races and conditions” in a habeas corpus action brought by a fugitive slave. See Vamum v. Brien, 763 N.W.2d 862, 877 (Iowa 2009) (discussing In re Ralph, 1 Morris 1, 9 (Iowa 1839)).

. This case does not'require us to determine whether an individual facing extradition from Iowa because he or she has been charged with a crime in another state has a right to counsel under any provision of the United States Constitution or the Iowa Constitution.

. The “cases” language approved by the framers during the constitutional convention did not explicitly limit its import to cases implicating physical liberty. See 2 The Debates, at 741. Rather,, the word "liberty” appearing in article I, section 10 is unqualified by any restricting terms, suggesting the framers likely intended it to be construed in its broadest sense. See Iowa Const, art. I, § 10. To decide this case, however, we need not decide whether article I, section 10 extends the right to counsel to casés involving other liberty interests. Notwithstanding that fact, we have previously recognized the Iowa Constitution contemplates other liberty .interests, such as a parent’s "fundamental liberty interest in childrearing.” Santi v. Santi, 633 N.W.2d 312, 321 (Iowa 2001).

. The implied-consent advisory indicated that under state law the driver's refusal to submit would result in the immediate revocation of his driver’s license for one year. Id. at -, 133 S.Ct. at 1557, 185 L.Ed.2d at 702-03. In addition, a state statute provided any person who operated a vehicle on a public highway within the state was “deemed to have given consent to” a chemical test. Mo. Rev.Stat. §§ 577.020.1, .041 (2011). Like the statute in McNeely, the Iowa Code provides that implied consent to a chemical test exists whenever any person operates a motor vehicle under specified conditions anywhere within the State. See Iowa Code § 321J.6.